Mark D. HASHIMOTO, as Chapter 11 Trustee of Sheffield Metals Trading, Ltd., an Arizona corporation, Plaintiff,

v.

James R. CLARK; Republic Bank California, N.A., a National Bank; Safrabank California, formerly a California State Bank; Republic New York Corporation, a Maryland corporation; Kathleen Clark; and Republic National Bank of New York, a National Bank, Defendants.

Republic Bank California, N.A., Safrabank California; Safracorp California; Republic New York Corporation; and Republic National Bank of New York, Cross-claimants,

v.

James R. Clark and Kathleen Clark, Cross-defendants.

No. CIV 95–1554 PHX EHC (JWS).

United States District Court, D. Arizona.

March 2, 2001.

Rick Cecala, Phoenix, AZ, for Mark D. Hashimoto.

Mark Floyd Pomerantz, Rita McCloy Stephanz, New York City, for Republic Bank of California, Safrabank, California, SafraCorp California, Republic New York Corporation, and Republic National Bank of New York.

Richard R. Murphy, Susanville, CA, for James R. Clark and Kathleen Clark.

## ORDER FROM CHAMBERS

SEDWICK, District Judge.

### I. MOTIONS PRESENTED

At docket 106, defendants Republic Bank of California, Safrabank California, SafraCorp California, Republic New York Corporation, and Republic National Bank New York (hereinafter referred to singularly as "Safrabank" unless the context dictates otherwise) move for summary judgment. Plaintiff Mark D. Hashimoto ("Trustee") on behalf of Sheffield Metals Trading, Ltd.. ("Sheffield") opposes at docket 112, and Safrabank replies at docket 115. Oral argument was heard on January 24, 2001.

### II. BACKGROUND

The material facts in this case are undisputed. Safrabank was formerly a California state bank.[1] Through its collateral

---

1. Docket 107 ("Safrabank's SOF"), ¶ 3 at 1. Safrabank was owned by SafraCorp California. In 1993, Safrabank changed its name to the Republic Bank of California, N.A. Later

loan division, Safrabank engaged in broker-referred margin metals purchase financing pursuant to which it made retail purchase finance loans available to individual purchasers of precious metals.[2] The loans were collateralized by the metals purchased which were held in the care and custody of Safrabank either at Safrabank's own storage facility or at some other institution.[3] Safrabank's collateral loan division also made loans available to wholesale dealers.[4]

. In late 1991, Safrabank elected to withdraw from the business of extending loans to broker-referred retail purchasers of precious metals.[5] Safrabank informed its retail borrowers that they would have to liquidate their loans by (1) paying them off, (2) asking Safrabank to sell the collateral and apply the proceeds to the loan, or (3) securing a loan from another source and transferring the collateral to the new lender.[6] Safrabank alleges that it made no difference to it which option its retail borrowers elected to pursue and made no recommendations regarding successor lenders.[7] If a customer decided to arrange for new financing, the successor lender paid Safrabank the balance of the loan, and Safrabank, at the direction of the borrower, transferred the collateral to the successor lender or that lender's designee.[8] Once this process was complete, Safrabank's relationship with its former borrower allegedly ended, and it no longer had any interest in the collateral that was transferred.[9] As of December 23, 1991, Safrabank had 2,747 such loans to liquidate.[10]

Sheffield was formed in 1983 as a wholesale metals dealer by James Clark ("Clark").[11] Clark was the company's president and sole shareholder[12] and by all accounts was Sheffield's sole decision maker.[13] Clark's wife, Kathleen Clark, was also a Sheffield director.[14] As a dealer, Sheffield bought and sold precious metals both on its own behalf and for retail customers.[15] Sheffield also supplied metals to brokers who had their own retail

---

that year, Republic New York Corporation, which already owned Republic National Bank of New York, acquired both SafraCorp California and Republic Bank California, N.A. *Id.*

**2.** Docket 98 ("Third Amended Complaint"), ¶ 10 at 3; Safrabank's SOF, ¶ 11 at 4. The collateral loan division was headed by Ned Fenton who was assisted by senior officers Glen Gregos and Brian Hayes Gregson. *Id.*

**3.** Third Amended Complaint, ¶ 11 at 3; Safrabank's SOF, ¶ 11 at 4.

**4.** Safrabank's SOF, ¶ 11 at 4.

**5.** Safrabank's SOF, ¶ 12 at 4. It appears as if Safrabank's decision was prompted by several lawsuits that implicated its collateral loan division. Docket 113 ("Trustee's SOF"), ¶ 4 at 6–7. Allegedly, Safrabank decided to exit this business because it was too expensive to defend against the many suits. *Id.* at 7. In addition, as part of a settlement agreement that resolved a class action suit brought against its collateral loan division, Safrabank

agreed to implement plans to leave the retail precious metals-backed lending business by June 30, 1992. Trustee's SOF, ¶ 5 at 7.

**6.** Safrabank's SOF, ¶ 12 at 4.

**7.** *Id.*

**8.** *Id.*

**9.** *Id.* at 5.

**10.** *Id.* at 4.

**11.** Safrabank's SOF, ¶ 4 at 1–2.

**12.** *Id.*

**13.** Safrabank's SOF, ¶ 4 at 2; Third Amended Complaint, ¶ 70 at 13.

**14.** Safrabank's Supplemental SOF, ¶ 1 at 1.

**15.** Safrabank's SOF, ¶ 6 at 2–3.

customers.[16]

Sheffield operated out of a two-room office in Phoenix, Arizona, that consisted of a front office for the company's clerical staff and a rear office that served as the company's "trading room."[17] Sheffield rarely had more than five employees.[18] The two primary employees in addition to Clark were Lana Smith ("Smith) and Scott Cameron ("Cameron").[19] Smith provided bookkeeping assistance, tracked material and funds movement, and handled customer relations.[20] Cameron was an account representative who assisted Clark in Sheffield's trading room and tracked Sheffield's loan obligations.[21] Mary Wales ("Wales") and Bradley Reifler ("Reifler") also worked for Sheffield during at least part of the time relevant to this action.[22] Wales assisted Smith in tracking Sheffield's metals inventory.[23] Reifler was employed as a futures broker.[24]

Sheffield was one of Safrabank's borrowers.[25] In 1983 or 1984, Sheffield opened a revolving line of credit with Safrabank that was secured by an inventory of precious metals.[26] Sheffield informed Safrabank that Clark was its president and sole shareholder and that it was in the business of buying and selling precious metals as a precious metals dealer.[27] Sheffield's unaudited financial statements that were provided to Safrabank in 1984 showed roughly equal current assets and liabilities, a small net worth with most of Clark's equity in the form of paid in capital.[28] The limit on Sheffield's line of credit varied. In 1988, the limit was $5,000,000; by 1992, it was only $250,000.[29]

When Safrabank decided to end its broker-referred purchase financing program, one or more precious metals brokers urged Sheffield to become a successor lender to certain borrowers.[30] Between December 1991 and June 1992, Sheffield assumed approximately 200 of Safrabank's loans that the Trustee has valued at $3,496,369.41.[31] After June 1992, Sheffield acquired numerous additional loans from lenders other than Safrabank.[32] As of July 29, 1993, Sheffield had a total loan balance of $17,492,051[33] and should have held $24,433,611 in collateral.[34]

Borrowers who elected to have another lender pay off their Safrabank loan notified Safrabank of their decision by submit-

---

16. *Id.*

17. Safrabank's SOF, ¶ 2 at 1 and ¶ 4 at 1–2.

18. *Id.*

19. *Id.*

20. *Id.*

21. *Id.*

22. Safrabank's SOF, ¶¶ 22 and 23 at 8.

23. Safrabank's SOF, ¶ 22 at 8.

24. Safrabank's SOF, ¶ 23 at 8.

25. Safrabank's SOF, ¶ 9 at 3.

26. Third Amended Complaint, ¶ 17 at 4; Safrabank's SOF, ¶ 9 at 3.

27. Third Amended Complaint, ¶ 19 at 4.

28. Third Amended Complaint, ¶ 26 at 5; Trustee's SOF, ¶ 1 at 5.

29. Safrabank's SOF, ¶ 9 at 3. The line of credit was reduced because Sheffield did not use the line of credit to its fullest extent. *Id.*

30. Safrabank's SOF, ¶ 13 at 5.

31. Safrabank's SOF, ¶ 14 at 5.

32. *Id.*

33. *Id.* (*citing* docket 109, exh. U (exhibit D to F. Wayne Elggren's expert report)).

34. Trustee's SOF, ¶ 235 at 48 (*citing* docket 113, exh. 38 (Elggren's expert report at 5–6 and Exhibit D)).

ting a form, sent to them by Safrabank, that authorized Safrabank to accept payment from the designated successor lender and to make the borrower's collateral "available" to "the custody and care of" that lender.[35] Where borrowers chose to use Sheffield as the successor lender, Safrabank disposed of the collateral, upon payment of the loan, per directions from Sheffield.[36]

Sheffield, through Clark, sold a lot, if not all of the metals, that Safrabank transferred to it.[37] It was Clark's belief that unless and until borrowers paid off their loan they had no right to the physical metal itself.[38] In the meantime, Clark believed that Sheffield could use the metals for its daily operations.[39] In most or all cases, the metals were sold shortly after Sheffield paid off the original Safrabank loans.[40] Sheffield used the funds gained through the sales to purchase additional loans[41] as well as metals futures contracts, typically Standard & Poor's stock index futures.[42] Succinctly, Sheffield took an unhedged short position with respect to each borrower's collateral and left itself entirely exposed to the volatility of the silver market.[43]

Safrabank contends that there was "nothing unusual" about the directions it received from Sheffield respecting the transfer of collateral and in each instance carried out those instructions "without question."[44] Moreover, Safrabank contends its senior management never knew that Sheffield was instructing it to transfer the collateral to third parties.[45] Trustee disputes Safrabank's characterization of the instructions it received from Sheffield.[46] Trustee contends that instructions to transfer collateral to third parties would be unusual as Safrabank has admitted that it was unaware of any comparable sales by other successor lenders.[47] In addition, Trustee contends that Safrabank's senior management did know of the sales because some of the transfers appear to have been completed on Ned Fenton's authority.[48]

The price of silver rose significantly in mid 1993.[49] As a result, Sheffield lost $1,933,182.69 trading futures and was unable to purchase enough metals to replace the collateral it had sold.[50] On July 29, 1993, Sheffield filed for bankruptcy, and Hashimoto was appointed as trustee. This action was commenced in July 1995. The operable complaint is the Third Amended Complaint which was filed on June 9, 2000,

---

35. Safrabank's SOF, ¶ 15 at 5–6 (The form was entitled "Instructions to Safrabank (California) to Pay Off Loan and Deliver Collateral." A copy is at docket 109, exh. Y).

36. Safrabank's SOF, ¶¶ 16 and 17 at 6

37. Safrabank's SOF, ¶ 16 at 6; Trustee's SOF, ¶ 16 at 3.

38. Trustee's SOF, ¶ 74 at 24 and ¶ 78(3) at 25.

39. Trustee's SOF, ¶ 78(3) at 25.

40. Trustee's SOF, ¶ 78(10) at 25.

41. Trustee's SOF, ¶ 78(9) at 25.

42. Trustee's SOF, ¶ 78(4) at 25.

43. Trustee's SOF, ¶ 78(5)–(7); Safrabank's SOF, ¶ 22 at 8. Most of the collateral at issue in this case is silver bullion.

44. Safrabank's SOF, ¶ 17 at 6.

45. Id.

46. Trustee's SOF, ¶ 17 at 3.

47. Id. (citing docket 113, exh. 36 (Safrabank's response to Trustee's interrogatory No. 4 at 8)).

48. Trustee's SOF, ¶ 17 at 3, ¶ 130 at 34 and ¶ 175 at 39–40.

49. Safrabank's SOF, ¶ 33 at 11.

50. Id.

against the several bank defendants.[51] Fourteen claims are pled:

I) Fraud;

II) Aiding and Abetting Fraud;

III) Breach of Fiduciary Duty;

IV) Aiding and Abetting Breach of Fiduciary Duty;

V) Conspiracy and Collusive Tort;

VI) Conversion;

VII) Liability for Intended Consequences—Prima Facie Tort;

VIII) Intentionally Causing Civil Liability;

IX) RICO Civil Liability under 18 U.S.C. § 1962(c);

X) Civil Liability under A.R.S. § 13–2314.04;

XI) Bankruptcy Liability based on 11 U.S.C. §§ 554(b) and 550;

XII) Bankruptcy Liability based on 11 U.S.C. §§ 548 and 550;

XIII) Bankruptcy Liability based on 11 U.S.C. §§ 547(b) and 550; and

XIV) Negligence.

In 1996, Safrabank moved to dismiss all of the non-bankruptcy claims based on two independent theories. First, Safrabank argued that Trustee was trying to recover for injuries to Sheffield's customers rather than to Sheffield itself and lacked standing to bring the customers' claims. The court found Sheffield and, hence, Trustee had standing.[52] Second, Safrabank argued that Trustee could not recover against it because all of Clark's wrongdoing must be imputed to Sheffield. Relying on *Meyer v. Glenmoor Homes*,[53] the court concluded that California law[54] did not impute to a corporation the knowledge of an agent that acted adversely to the corporation's interests.[55] Consequently, the motion to dismiss was denied.

## III. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if there is no genuine dispute as to material facts and if the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that there is no genuine dispute as to material fact.[56] The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[57] Once the moving party has met this burden, the non-moving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[58] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-mov-

---

**51.** A previous version of the complaint included James and Kathleen Clark as defendants. Trustee dropped his claims against the Clarks when James Clark filed for bankruptcy. Safrabank contends that the Clarks are still parties to this action by virtue of its third-party claims against them for indemnification and contribution. *See* docket 106 at 4 n. 1.

**52.** Docket 36 at 8–9.

**53.** 246 Cal.App.2d 242, 54 Cal.Rptr. 786 (1966).

**54.** The court determined that California applied to the common law claims. Docket 36 at 7. California law will again be used in evaluating the merits of the common law claims.

**55.** Docket 36 at 10–11.

**56.** *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

**57.** *Id.* at 323–25, 106 S.Ct. at 2552–54.

**58.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

ant.[59] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[60]

## IV. DISCUSSION

Trustee's claims can be divided into three general categories: common law claims (counts I–VIII and XIV), RICO claims (counts IX and X), and bankruptcy claims (counts XI–XIII).

### A) Common Law Counts

#### 1) Fraud, Breach of Fiduciary Duty, and Negligence

Trustee alleges that Safrabank failed to disclose to Sheffield three material facts:

1) that Clark was directing it to dispose of the metals collateralizing the loans Sheffield had assumed;

2) that Clark was selling the metals that it made available to Sheffield and was using the funds generated thereby to speculate and to incur debts Sheffield could not repay; and

3) that it was making all the metals it held on account of borrowers whose loans were being liquidated equally available to Sheffield to either apply to its own line of credit or to sell to third parties.[61]

Reasonably construing Trustee's complaint, he alleges that Safrabank's failure to disclose these facts gives rise to a claim for fraud because Safrabank knew that these facts were material and intended Sheffield to rely on their non-disclosure which Sheffield reasonably did to its detriment.[62]

■■■ "Actual fraud" and "deceit" are defined in similar terms by California's civil code.[63] The elements of fraud that give rise to an action for deceit are a misrepresentation (which can include a false representation, concealment or non-disclosure), knowledge of falsity (also referred to as scienter), an intent to induce reliance, justifiable reliance, and resulting damage.[64] Where a claim of fraud is based on the concealment or non-disclosure of a material fact, there are four circumstances in which liability may exist: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to plaintiff; (3) when the defendant conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts."[65] Consequently, a threshold issue is whether a fiduciary relationship existed between Safrabank or Sheffield.

■■■ It is well established that a fiduciary relationship does not exist between a bank and its depositors or its borrowers[66]

59. *Id.* at 255, 106 S.Ct. at 2513.

60. *Id.* at 248–49, 106 S.Ct. at 2510.

61. Third Amended Complaint, ¶¶ 74–76 at 14.

62. Third Amended Complaint, ¶ 77 at 14.

63. *Zinn v. Ex–Cell–O Corp.*, 148 Cal.App.2d 56, 306 P.2d 1017, 1025 (1957) (*citing* Cal.Civil Code §§ 1572, 1709 and 1710)

64. *Engalla v. Permanente Medical Group Inc.*, 15 Cal.4th 951, 64 Cal.Rptr.2d 843, 938 P.2d 903, 917 (1997) (citations omitted).

65. *LiMandri v. Judkins*, 52 Cal.App.4th 326, 60 Cal.Rptr.2d 539, 543 (1997) (citations omitted).

66. *E.g.*, *Kim v. Sumitomo Bank of California*, 17 Cal.App.4th 974, 21 Cal.Rptr.2d 834, 836 (1993); *Niederreuther v. Schifter*, 1998 WL 409876 *1 (N.D.Cal. July 14, 1998).

absent evidence that the bank took on a "special relationship" with the customer.[67] A special relationship might exist where a bank, through a loan agreement, is able to control a borrower,[68] offers any provision of trust or fiduciary services,[69] or otherwise agrees to serve as a financial advisor.[70] A special relationship connotes more than a customary, arm's-length transaction.[71] The essence of the relationship is that "the parties do not deal on equal terms, because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party." [72]

■ There is no evidence to suggest that such a relationship existed between Safrabank and Sheffield. The evidence is that Sheffield was a customer of Safrabank.[73] There is no evidence that Safrabank controlled Sheffield, offered Sheffield any provision of trust or fiduciary services, or otherwise provided Sheffield with financial advice.[74] Furthermore, there is no evidence that Safrabank and Sheffield

were dealing on unequal terms or that Safrabank had assumed a position of trust or confidence vis-a-vis Sheffield such that it was able to exert unique influence over it. In short, the evidence establishes that Safrabank and Sheffield conducted a series of arm's-length transactions, nothing more.

Trustee contends that a fiduciary relationship could be found to exist for three reasons. First, because Safrabank and Sheffield formed a joint venture "for the common purpose of moving Safrabank's loan portfolio, in compliance with Safrabank's goal and obligation to be out of business by June 30, 1992." [75] Second, because Safrabank, by making loans available to Sheffield, placed Sheffield in the position of being a lender and accordingly "assumed a position of special confidence and trust on which Sheffield relied." [76] Third, because Safrabank was a pledgee holding the metals as pledged property on Sheffield's behalf.

■ Trustee's arguments are unpersuasive because they are unsupported by

67. *E.g., Kim,* 21 Cal.Rptr.2d at 836–38; *Niederreuther,* 1998 WL 409876 at *1.

68. *Kim,* 21 Cal.Rptr.2d at 837–38.

69. *Niederreuther,* 1998 WL 409876 at *1 (*citing Peterson Dev. Co. v. Torrey Pines Bank,* 233 Cal.App.3d 103, 284 Cal.Rptr. 367 (1991)).

70. *Id.* at *2.

71. *Cascade Investments Inc. v. Bank of America, N.A.,* 2000 WL 1842945 at *2 (D.Nevada September 29, 2000) (*citing Price v. Wells Fargo Bank,* 213 Cal.App.3d 465, 261 Cal. Rptr. 735, 738–40 (1989)).

72. *Beery v. State Bar,* 43 Cal.3d 802, 239 Cal.Rptr. 121, 126–27, 739 P.2d 1289 (1987) (citation omitted).

73. Safrabank's SOP, ¶ 9 at 3.

74. *See* Safrabank's SOF, ¶ ¶ 24, 26, 28 and 32 at 9–11. Trustee disputes that Safrabank did

not participate in Sheffield's internal operations. Trustee's SOF, ¶ 24 at 4. The objection is based on evidence that Safrabank participated in transferring the loans to Sheffield and moving the metals according to Sheffield's instructions. *Id.* While these activities establish Safrabank's participation in a lender-successor lender relationship with Sheffield, they do not establish any participation in Sheffield's internal operations or in any way evince an ability to control Sheffield.

Trustee also disputes Safrabank's SOF, ¶ 26, insofar as Safrabank contends that it had no knowledge of Sheffield's financial ability to fund its loan program. Trustee contends that the exact opposite is true. Trustee's SOF, ¶ 26 at 5. The court acknowledges this discrepancy only insofar as to note that it does not rely on the disputed portion of paragraph 26.

75. Docket 112 at 18–19.

76. *Id.* at 19.

either the evidence or the law. A joint venture is an undertaking by two or more persons to carry out a common business for profit.[77] Three elements are necessary to a joint venture's formation: (1) a joint interest in a common business, (2) an agreement to share in the profits or losses of the enterprise, and (3) a right to joint control.[78] A joint venture may be created by verbal agreement or can be assumed to exist based on the acts and declarations of the parties.[79] Regardless, " '[t]he existence of a joint venture depends upon the intention of the parties.' " [80] The issue can be decided as a matter of law on a motion for summary judgment where there is no evidence that any of the prerequisite elements existed.[81] This case falls into that category. Trustee has come forward with no evidence that Safrabank and Sheffield intended to form a joint venture in which they would engage in a common business, share profits and losses or exercise joint control. Nor do their actions demonstrate such an intent. To the contrary, the evidence demonstrates that both Safrabank and Sheffield were acting according to their own business plans without regard to the other.[82] Therefore, as a matter of law, the court concludes that no joint venture existed.

Similarly, the court concludes that the evidence does not support Trustee's second theory. There is no evidence to suggest that Safrabank somehow lured Sheffield into assuming many of its loans or into a position of reliance. The extent of Safrabank's involvement is that it notified its precious metals purchase borrowers that it was liquidating the loans; gave the borrowers three options, one of which was finding a successor lender; and, for those borrowers who elected to find a new lender, followed the borrowers' directions as to where to transfer their collateral.[83] None of these actions changed the nature of the relationship between Safrabank and Sheffield.[84] Put another way, there was nothing out of the ordinary in Safrabank's actions. They were the typical actions of a lender that was liquidating its loans.

 Trustee presented his third argument at oral argument: that Safrabank owed Sheffield a fiduciary duty that was based on Safrabank's status as a pledgee of metals held on Sheffield's account. Trustee cited the case of *Hartford v. State Bar of California*[85] in support of his argument. *Hartford* stands for the general proposition that a "pledgee owes a fiduciary duty of care to preserve and protect the pledged property, and may be liable for conversion if the pledge is wrongfully sold or transferred without authority." [86] *Hartford* has no application here because Safrabank and Sheffield were not in a pledgee-pledgor relationship. A pledge is

---

**77.** *580 Folsom Assocs. v. Prometheus Dev. Co.,* 223 Cal.App.3d 1, 272 Cal.Rptr. 227, 234 (1990).

**78.** *Id.; Orosco v. Sun–Diamond Corp.,* 51 Cal. App.4th 1659, 60 Cal.Rptr.2d 179, 184 (1997).

**79.** *580 Folsom Assocs.,* 272 Cal.Rptr. at 234.

**80.** *Id. (quoting Boyd v. Bevilacqua,* 247 Cal. App.2d 272, 55 Cal.Rptr. 610, 619 (1966)).

**81.** *See e.g. Orosco,* 60 Cal.Rptr.2d at 184.

**82.** *See* Safrabank's SOF, ¶¶ 26–28 and 32 at 9–10 and 10–11; Trustee's SOF, ¶¶ 74–76 and 78 at 24 and 25.

**83.** Safrabank's SOF, ¶ 12 at 4.

**84.** Nor do the "participatory" acts alleged in ¶¶ 6–49 of Trustee's SOF change the relationship.

**85.** 50 Cal.3d 1139, 270 Cal.Rptr. 12, 791 P.2d 598 (1990).

**86.** *Id.* at 20 n. 11 (citation omitted).

a bailment for security.[87] Because Safrabank carried the loans of the individual retail purchasers, Safrabank quite possibly paid off the loans and gave Safrabank instructions to deliver the metals to specific accounts or locations. There is no evidence to suggest that Sheffield delivered the metals to Safrabank with the understanding that Safrabank was to hold the metals as pledged property on Sheffield's behalf. It follows that a fiduciary relationship did not exist between Safrabank and Sheffield.

■■■ As is discussed above, there are three non-fiduciary circumstances in which the non-disclosure of a material fact may be actionable: (1) when the defendant has exclusive knowledge of material facts not known to plaintiff; (2) when the defendant conceals a material fact from the plaintiff; and (3) when the defendant makes partial representations but also suppresses some material facts.[88] Though a fiduciary relationship is not required, each of these circumstances presupposes that the parties have some relationship that has been based on transactions between them.[89] Relationships which qualify typically include that between a buyer and seller, an employer and prospective employee, a doctor and patient or parties to a contract.[90]

■■■ Trustee contends that four aspects of its relationship with Safrabank could give rise to a duty to disclose on Safrabank's part:

A. Safrabank held metals in trust on Sheffield's behalf;

B. Safrabank was an active participant in the scheme because it advised Sheffield of customer payoff dates,

processed the payoffs and delivered the collateral;

C. Safrabank had reason to know that Sheffield's other employees or other director (Kathleen Clark) did not know that Clark was acting inappropriately; and

D. relevant banking regulations impose a duty to investigate and report fraud.[91]

It is undisputed that when Safrabank's borrowers requested that their loans be transferred to Sheffield, Safrabank assisted Sheffield in getting the transfer accomplished. In particular, Safrabank asserts that there was "a constant stream of correspondence" from Sheffield regarding its purchase of Safrabank's loans and that Safrabank followed these instructions "without question."[92]

While it can be argued that Safrabank had a duty to disclose the recklessness of Clark's actions to Sheffield based on these "transactions," the court must reject that argument because neither of the two California statutes which codify the common law elements of a fraud cause of action include them. Civil Code section 1572, which codifies the elements of a common law "actual fraud" cause of action, specifically limits fraud to parties to a contract. Because no contract existed between Safrabank and Sheffield with respect to the loan transactions, it cannot apply to this situation. Similarly, Civil Code section 1709, which codifies the elements of a common law "deceit" cause of action, limits its scope to one who "willfully deceives another with intent to induce him to alter his

---

87. *Id.*

88. *LiMandri,* 60 Cal.Rptr.2d at 543 (citation omitted).

89. *Id.* (citations omitted).

90. *Id.* (*citing* Cal.Civ.Code § 1572, subd. 3).

91. Docket 112 at 17–18.

92. Safrabank's SOF, ¶ 17 at 6.

position to his injury or risk.... " Here, there is no evidence that Safrabank willfully sought to deceive Sheffield. Consequently, the predicate facts requisite to a duty to disclose are missing.

Because the court concludes that Safrabank owed Sheffield neither a fiduciary duty nor a duty to disclose, summary judgment is appropriate on counts I, III, and XIV, the fraud, breach of fiduciary duty, and negligence causes of action.

### 2. Aiding and Abetting Liability

Trustee's state law claims include two causes of action that are premised on aiding and abetting liability: count II states a cause of action for aiding and abetting Clark's fraud on Sheffield and count IV states a cause of action for aiding and abetting Clark's breach of his fiduciary duties to Sheffield. In opposition to the present motion, Trustee contends summary judgment is inappropriate as to its aiding and abetting causes of action because a reasonable trier-of-fact could find Safrabank liable for aiding and abetting based on evidence that Safrabank knew that Clark was selling the metals, knew that those sales were putting Sheffield in a precarious financial position, and yet continued to make loans available to Sheffield.[93]

California law imposes liability for aiding and abetting the commission of an intentional tort in two circumstances: (1) where an individual is aware that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act, or (2) where an individual gives substantial assistance to another in accomplishing a tortious result and the individual's own conduct, when separately considered, constitutes a breach of duty to a third person.[94] With respect to the first theory, it is incumbent upon Trustee to show that there is evidence from which a trier-of-fact could conclude that Safrabank had actual knowledge of Clark's breach of duty and provided substantial assistance with the intent to further his scheme. The requisite degree of knowledge for an aiding and abetting claim is actual knowledge.[95] This means Trustee must come forward with evidence to show that Safrabank knew Clark was breaching a duty owed Sheffield. It is undisputed that Safrabank knew Sheffield was in some manner disposing of the metals it was acquiring. Nevertheless, the senior officers of Safrabank's collateral loans division, Ned Fenton, Glen Gregos, and Brian H. Gregson,[96] have testified that they were unaware that Sheffield was misappropriating the collateral metals.[97] As far as these

---

**93.** *See* docket 112, § III(E) at 18 and § III(G) at 19.

**94.** *Saunders v. Superior Court*, 27 Cal.App.4th 832, 33 Cal.Rptr.2d 438, 446 (1994) (*citing* Restatement (Second) Torts § 876). Though neither formulation specifically states an intent element, some California cases indicate that an intent to further the tort is also required. *See Resolution Trust Corp. v. Rowe*, 1993 WL 183512 *5 (N.D.Cal. Feb. 8, 1993) (discussing aiding and abetting a fraud under California law) (*citing Gerard v. Ross*, 204 Cal.App.3d 968, 983, 251 Cal.Rptr. 604 (1988)). The court concludes that an intent element must be required because even where

that element is not specifically enumerated, it may nevertheless be inferred from the elements that are enumerated. In other words, the intent element is included within the knowledge and substantial assistance elements.

**95.** *Rowe*, 1993 WL 183512 at *5; Restatement (Second) Torts § 876 cmt. d (1979).

**96.** *See supra* note 2.

**97.** Docket 109, exh. D, Deposition of Glen Gregos, p. 86, ln. 21, exh. EE, Deposition of Brian H. Gregson, p. 51, ln. 4, and exh. G, Deposition of Ned Fenton, p. 82, ln. 17.

officers were concerned, the disposal of the metals presented no cause for alarm.[98] Sheffield was a metals dealer who, Safrabank assumed, regularly traded metals.[99] Furthermore, Safrabank had no reason to believe that Sheffield had not otherwise covered its positions.[100] These officers deny that Safrabank had any knowledge of Sheffield's overall metals positions [101] or of its futures trading.[102]

Trustee contends that Safrabank's denial of knowledge is disingenuous. Based on a variety of circumstantial evidence, Trustee argues that Safrabank knew or should have known of the fraud or breach of duty. Trustee's argument is based on evidence that Safrabank knew Sheffield was selling the metals it was acquiring, knew that Sheffield had few assets above its liabilities, knew that the silver market was volatile, and knew that the precious metals market was typically full of unscrupulous lenders.[103]

While the court is willing to concede that the evidence upon which Trustee relies could, in retrospect, raise red flags as to Sheffield's trading practices, that fact is not conclusive as to the degree of knowledge that Safrabank enjoyed at the time Sheffield bought the loans. As is described above, Safrabank owed no duty to Sheffield. In the absence of any duty,

proof of actual knowledge is required.[104] The evidence Trustee relies on cannot establish Safrabank's actual knowledge. Moreover, absent knowledge of the scheme or breach, Safrabank could have no intent to further either.[105]

A claim based on the second theory of aiding and abetting liability is similarly flawed. First, whatever duty Safrabank had to its borrowers,[106] it cannot be said that it breached that duty by selling their loans to Sheffield. The loans were only sold at the borrowers' directions [107] and, as is discussed above, Safrabank lacked actual knowledge that Sheffield was misappropriating the collateral. It follows that Trustee cannot make out either of his aiding and abetting claims.

### 3. Conspiracy and Collusive Tort

■ Trustee's conspiracy claim is premised on an alleged agreement between Safrabank and Clark to methodically shift many of Safrabank's precious metals retail loans to Sheffield. Trustee contends that Safrabank, through this alleged agreement, breached duties to its borrowers and Sheffield.[108] The claim suffers two flaws. First, as the court has already determined, Safrabank owed no duty to Sheffield. Second, there is no

---

98. Safrabank's SOF, ¶¶ 17–18 at 6–7.

99. Safrabank's SOF, ¶ 6 at 2–3 and ¶ 17 at 6.

100. Safrabank's SOF, ¶ 20 at 7.

101. Safrabank's SOF, ¶ 23 at 8–9.

102. Safrabank's SOF, ¶ 28 at 10.

103. Safrabank's SOF, ¶¶ 17–18 at 6–7; Trustee's SOF, ¶ 1 at 5–6, ¶ 3 at 6, ¶¶ 6–49 at 7–17, ¶¶ 61–62 at 21, ¶¶ 75–76 at 24, ¶ 83 at 26, ¶ 95 at 29, ¶ 164 at 38, and ¶ 175 at 39–40.

104. *Rowe*, 1993 WL 183512 at *6.

105. *See Rowe*, 1993 WL 183512 at *6.

106. It is doubtful that Safrabank owed any duty. As is discussed above, a bank does not owe a fiduciary duty to its borrowers. *See, supra,* note 66. Moreover, even if it could be argued that Safrabank owed a duty as the pledgee of the metals, *see* text, *supra,* at note 84, it is hard to see how that duty could have been violated in light of the instructions from the borrowers to sell their collateral to Sheffield.

107. Safrabank's SOF, ¶ 15 at 5–6.

108. *See* Third Amended Complaint, ¶ 103 at 18.

proof that Safrabank and Clark ever came to any kind of an agreement to engage in a common plan or design.

 Civil conspiracy is not a separate cause of action, but "a legal doctrine that imposes liability on persons, who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration."[109] Through participation, a co-conspirator adopts the torts of the tortfeasors as his or her own.[110] Nevertheless, conspiracy liability is limited; it " 'presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for that breach.' "[111] It follows that a cause of action alleging conspiracy is only actionable against a party who owes a duty imposed by substantive tort law principles.[112] Because Safrabank owed no duty to Sheffield, a civil conspiracy claim is not actionable against it.

 The elements of a civil conspiracy are an agreement, a wrongful act by any of the conspirators pursuant to the agreement, and damages.[113] Because the alleged conspiracy involves Safrabank and Clark, it depends upon proof of an agreement between those two parties. There is no proof of any such agreement. In fact, the evidence demonstrates that Safrabank and Clark had little contact[114] and that the choice to speculate in the futures market was entirely Clark's own.[115]

### 4. Conversion

 To establish a cause of action for conversion under California law, a plaintiff must establish three elements: a right to ownership or possession of the property at the time of the alleged conversion, a conversion by a wrongful act or disposition of those property rights, and damages.[116] Whether a conversion occurred by virtue of Safrabank's transfer of metals to third parties depends on whether those transfers constituted wrongful dispositions. It is Safrabank's position that the transfers were not wrongful because they were done at Sheffield's direction.[117] Trustee contends that the transfers were wrongful because Safrabank knew Sheffield could not lawfully sell the metals.[118]

The Restatement (Second) Torts section 235(1) defines conversion by misdelivery and is helpful on this point. Section 235(1) provides:

> . . . one who makes an unauthorized delivery of a chattel to a person not entitled to its immediate possession is subject to liability for conversion to another who is so entitled.[119]

**109.** *Khajavi v. Feather River Anesthesia Medical Group,* 84 Cal.App.4th 32, 100 Cal.Rptr.2d 627, 643 (2000).

**110.** *Id.*

**111.** *Id. (quoting Applied Equipment Corp., v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 28 Cal.Rptr.2d 475, 478, 869 P.2d 454 (1994)).

**112.** *Pavicich v. Santucci,* 85 Cal.App.4th 382, 102 Cal.Rptr.2d 125, 135 (2000).

**113.** *Stone v. Regents of the University of California,* 77 Cal.App.4th 736, 92 Cal.Rptr.2d 94, 102 n. 9 (1999).

**114.** Safrabank's SOF, ¶ 24 at 9.

**115.** Safrabank's SOF, ¶ 32 at 10–11.

**116.** *Hartford Financial Corp. v. Burns,* 96 Cal. App.3d 591, 158 Cal.Rptr. 169, 172 (1979).

**117.** Docket 106 at 32.

**118.** Docket 112 at 20.

**119.** Torts (Second) 235(1) (1979).

This section illustrates that Safrabank's liability depends upon whether its transfer of the metals was authorized. The facts as to that point are undisputed. Each time Safrabank transferred metals to third parties, it did so at Sheffield's direction.[120] Because the directions came from Sheffield, the transfers were authorized. It follows that no conversion occurred.

### 5. Intended Consequences and Intentionally Causing Civil Liability

■ It is undisputed that California courts have not as yet recognized a separate tort that creates liability for the "intended consequences" of one's actions. Nevertheless, Trustee argues that this court should recognize such a claim because there is no reason to doubt that California courts would do so.[121]

Trustee bases his intentional consequences cause of action on the Restatement (Second) of Torts section 870. The Restatement provides:

> One who intentionally causes injury to another is subject to liability to the other from that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability.

While the court doubts that California would separately recognize an intentional consequences tort where, as here, several established intentional torts are available, the court need not decide that issue. It is apparent from the language of the Restatement that there is no evidence in the record to support a section 870 cause of

action against Safrabank. The tort requires Trustee to demonstrate that Safrabank intentionally sought to injure Sheffield. There is absolutely no evidence that Safrabank had any such intent nor is there any evidence from which such an intent could be inferred. It follows that Trustee's intentional consequences claim must fail.

Trustee's cause of action for intentionally causing civil liability is similarly flawed. Restatement (Second) of Torts section 871A, on which the cause of action is based, requires proof that the defendant acted with the intent to create the liability.[122] There is no evidence that shows Safrabank had any such intent. Again, it follows that Trustee's claim, if cognizable under California law, must fail.

### 6. Imputation

■ A separate basis exists for a finding that Safrabank cannot be liable to Sheffield based on any of the common law claims brought by Trustee: imputation. Safrabank argues that there can be no liability because all of Clark's knowledge regarding the handling of the metals must be imputed to Sheffield. The court refused to apply the imputation doctrine in considering Safrabank's motion to dismiss. In summary, this court, citing *Meyer v. Glenmoor Homes, Inc.,*[123] adhered to the general rule under California agency law that the knowledge of an agent cannot be imputed to the principal where the agent is acting adversely to the principal.[124] Safrabank's present argument relies on *Bartoni–Corsi Produce, Inc. v. Wells Fargo*

120. Safrabank's SOF, ¶ 17 at 6.

121. Docket 112 at 20.

122. Restatement (Second) Torts § 871A cmt. c (1979).

123. 246 Cal.App.2d 242, 54 Cal.Rptr. 786 (1966).

124. Docket 36 at 10.

*Bank, N.A.*[125] which purportedly limits the *Meyer* general rule. Trustee argues that the imputation doctrine cannot apply because the court's earlier decision represents the law of the case and *Bartoni–Corsi Produce, Inc.* does not alter the California agency law.[126]

The California agency issues presented in this case were considered in the various stages of *Federal Deposit Insurance Corp. v. O'Melveny & Meyers,* a case that was argued to the United States Supreme Court and, as a result, twice to the Ninth Circuit. The Ninth Circuit, relying on *Glenmoor Homes, Inc.,* held that under California law the knowledge of a corporate officer would not be attributed to the corporation where the corporate officer acts to his or her own benefit and to the detriment of the corporation.[127] The Ninth Circuit refused to apply a similar rule in *Bartoni–Corsi Produce, Inc.* Instead, the circuit held that under California law a corporation (or its receiver), in dealing with a non-fiduciary third-party can be found to have authorized conduct by its agents which is detrimental to the corporation.[128] The Circuit reiterated this view in *Stanford University Hospital v. Federal Insurance Co.* wherein the court attributed the fraudulent actions of a corporation's sole shareholder and director to the corporation so as to prevent the corporation's recovery against an innocent third-party[129] Quoting from *Wenban Estate, Inc. v. Hewlett,*[130] the Ninth Circuit stated,

[I]t has been held that upon a sufficient showing that a corporation is but the instrumentality through which an individual, who is the sole owner of all of the corporate stock, for convenience transacts his business, equity, looking to the substance rather than the form of the relation, and the law as well, will hold such corporation obligated for the acts of the sole owner of the corporation to the same extent and just as he would be bound in the absence of the existence of the corporation.[131]

The circumstances in this case resemble those of *Bartoni–Corsi Produce, Inc.* and *Stanford University Hospital.* Safrabank was a non-fiduciary of Sheffield which was the instrumentality through which Clark orchestrated his ill-advised trading practices. It follows that the court should ignore Sheffield's separate corporate status and should impute Clark's actions to Sheffield.

 In this instance, the law of the case doctrine does not preclude imputation. The law of the case doctrine " 'merely expresses' the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." [132] In light of the parties' additional briefing and the development of the underlying facts of the case, the court concludes that its earlier conclusion should be revised.

125. 130 F.3d 857 (9th Cir.1997).

126. Trustee presented these points at oral argument. *See also* docket 112 at 15.

127. *Federal Deposit Ins. Corp. v. O'Melveny & Meyers,* 969 F.2d 744, 750–51 (9th Cir.1992) (republished on remand from Supreme Court in *Federal Deposit Ins. Corp. v. O'Melveny & Meyers,* 61 F.3d 17, 19 (9th Cir.1995)).

128. *Bartoni–Corsi Produce, Inc.,* 130 F.3d at 862–63.

129. 174 F.3d 1077, 1086–87 (9th Cir.1999).

130. 193 Cal. 675, 227 P. 723 (Cal.1924).

131. 174 F.3d at 1086 (*quoting Wenban Estate, Inc.,* 193 Cal. at 696–97, 227 P. 723).

132. 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction § 4478 (1981) (*quoting Messenger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912)).

### B. RICO Counts

Trustee alleges two RICO violations against Safrabank: in count IX a violation of the federal RICO statutory scheme and in count X a violation of Arizona's RICO statutory scheme. These will be addressed in turn.

 The elements of a federal RICO violation include:

(1) the commission of two or more acts (2) constituting a "pattern" (3) of "racketeering activity" through which (4) the culpable person (5) invests in, maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate commerce.[133]

Trustee bases Safrabank's liability on alleged acts of mail and wire fraud.[134] This claim is untenable because, as is discussed above, Safrabank did not commit any fraud.

 Trustee's RICO claim is also untenable because there is no evidence that Safrabank "participated" in an "enterprise." The participation element may be established in more than one way. Plaintiff may show that the defendant directly participated in the operations or management of an enterprise meaning that defendant played some part in directing the affairs [135] or may show that defendant conducted activities in the scope of an informal association that, while not a separate legal entity, constituted an "association in fact." [136]

Trustee has alleged two enterprises involving Safrabank: either Safrabank had direct involvement with Sheffield [137] or participated in an association in fact with Clark.[138] Under either scenario, Trustee alleges that Safrabank participated in the enterprises by carrying out the loan transfers and subsequent trades for Clark on Sheffield's account while knowing that Clark's speculation might ultimately render Sheffield insolvent.[139] Trustee's RICO claim survived Safrabank's motion to dismiss because the court concluded that Trustee's "allegation that [Safrabank] participated in two alternative associations is consistent with the facts alleged in the Amended Complaint." [140] Trustee now argues that summary judgment is inappropriate because the "facts are, in the main, as they were alleged...." [141] The court disagrees. The facts are not as they were alleged and, on a motion for summary judgment, the court will not assume that mere allegations of fact are true. To the contrary, where the moving party has carried his burden to show that no genuine issues of fact exist and judgment is proper as a matter of law, the non-moving party must set forth specific facts showing the

---

**133.** *Rowe,* 1993 WL 183512 at *7 (*citing Sedima S.P.R.L. v. Imrex Company, Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).

**134.** Third Amended Complaint, ¶¶ 117 and 118 at 20–21.

**135.** *Baumer v. Pachl,* 8 F.3d 1341, 1344 (9th Cir.1993) (discussing *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)).

**136.** *River City Markets Inc. v. Fleming Foods West, Inc.,* 960 F.2d 1458, 1461 (9th Cir.1992) (discussing *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)).

**137.** Third Amended Complaint, ¶¶ 114 and 116 at 20.

**138.** Third Amended Complaint, ¶¶ 115 and 116 at 20.

**139.** Third Amended Complaint., ¶¶ 115–117 at 20–21.

**140.** Docket 36 at 14.

**141.** Docket 112 at 22.

existence of a genuine issue for trial.[142] Trustee has not done so. As is discussed above, it is uncontroverted that Safrabank did not participate in Sheffield's affairs [143] and that Clark acted alone.[144] Without any evidence to the contrary, no reasonable trier-of-fact could conclude that Safrabank participated in either of the two alleged enterprises.

As to the Arizona RICO count, Trustee bases Safrabank's liability on alleged acts of fraud and money laundering.[145] That portion of the count that is premised on alleged acts of fraud must necessarily fail. Though more of an explanation is required, the same is true of that portion of the count that is premised on alleged acts of money laundering.

Money laundering is defined by statute to include any person who:

1. Acquires or maintains an interest in, transacts, transfers, transports, receives or conceals the existence or nature of racketeering proceeds knowing or having reason to know that they are the proceeds of an offense.

2. Makes property available to another by transaction, transportation or otherwise knowing that it is intended to be used to facilitate racketeering.

3. Conducts a transaction knowing or having reason to know that the property involved is the proceeds of an offense and with the intent to conceal or disguise the nature, location, source, ownership or control of the property or the intent to avoid a transaction reporting requirement under title 6, chapter 12.

4. A person who knowingly initiates, organizes, plans, finances, directs, manages, supervises or is in the business of money laundering is guilty of money laundering in the first degree.[146]

A common element to all four definitions is knowledge: the alleged perpetrator must have knowledge that a racketeering activity or money laundering is occurring. As is discussed above, Safrabank lacked any such knowledge.[147] It follows that Trustee's claim based on the alleged violation of Arizona law must fail.

### C. Bankruptcy Counts

In counts XI–XIII, Trustee alleges three bankruptcy claims which collectively seek to void payments that Sheffield made to Safrabank prior to the date it filed a petition for bankruptcy. Count XI seeks to make use of the authority given Trustee under 11 U.S.C. § 544(b) to invalidate any pre-bankruptcy transfers that are voidable under applicable law by a creditor holding an allowable, unsecured claim. Trustee contends that payments Sheffield made to Safrabank between July 29, 1989, and July 29, 1993, are voidable as fraudulent conveyances as defined by A.R.S. § 44–1001.[148] These include payments Sheffield

---

142. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

143. *See* notes 73 and 81, *supra*.

144. *See* notes 113 and 114 *supra*.

145. Third Amended Complaint, ¶ 122 at 21 (alleging violations of A.R.S. §§ 13–2310 (fraud) and 13–2317 (money laundering)).

146. A.R.S. § 13–2317.

147. *See* section IV(A)(2), *supra*.

148. Third Amended Complaint, ¶ 125 at 22. Though Trustee seeks to recover transfers over a four-year period, Safrabank correctly points out that the appropriate statute of limitations under Arizona law is three years. Docket 106 at 33 (citing A.R.S. § 12–543).

made to Safrabank towards its revolving line of credit as well as payments to pay off the loans Sheffield was purchasing.[149] Count XII seeks to use the authority given Trustee by 11 U.S.C. § 548 to void transfers Sheffield made to Safrabank between July 29, 1992, and July 29, 1993, because they were made with the "actual intent to hinder, delay or defraud an entity to which Sheffield was, or became indebted to, on or after the date of transfer...." [150] This count encompasses only payments that Sheffield made on its revolving line of credit.[151] Finally, count XIII seeks to use 11 U.S.C. § 547(b) to invalidate preferential transfers that Sheffield made to Safrabank between July 29, 1992, and July 29, 1993, which enabled Safrabank to receive more than it would have received from the bankruptcy estate.[152]

### 1. Actual Intent to Hinder, Delay or Defraud

■ It is evident that the bankruptcy claims contained in counts XI and XII are untenable in that each requires proof of an actual intent to hinder, delay or defraud a creditor of the debtor. With respect to count XI, the actual intent element is derived from the elements of a fraudulent conveyance under A.R.S. § 44-1004(A)(1).[153] Pursuant to that statute, a fraudulent conveyance "may be shown by clear and satisfactory evidence" of the requisite intent.[154] Trustee contends that this claim is actionable because, based on "Clark's own testimony that he commingled borrowers' funds, sold their metal, used their money for various purposes, including securing the transfer of additional loans from Safrabank, it is difficult to know what more evidence of intent to defraud [Safrabank] might require." [155] Trustee's argument is unpersuasive because it incorrectly characterizes Clark's testimony. While Clark admits that he took the actions Trustee describes, he testified that he did so because he believed he could legally do so and without any intent to defraud the borrowers. The following excerpts provide a good representation of his testimony:

Q: Also I think you indicated that it was your view of the particular relationship that had been created between Sheffield and Sheffield's customers that Sheffield was free to sell or otherwise dispose of the customer's collateral as long as it used the proceeds of the sale of the collateral otherwise to maintain the metals possessions of the customers, correct?

A: Yes.[156]

where, under certain circumstances, the debtor does not receive reasonable consideration for the transfer, Trustee has not alleged a fraudulent conveyance premised on this portion of the statute.

---

149. Docket 106 at 33.

150. Third Amended Complaint, ¶ 128 at 22.

151. *See id.*, ¶ 127 at 22.

152. *Id.*, ¶¶ 130 and 131 at 22–23. While the parties have not addressed the issue, it would appear to the court that Safrabank is not an "insider." *See* 11 U.S.C. § 101(31). Should this be accurate, it would necessarily follow that any claim to avoid preferential transfers would be limited to transfers made within 90 days of the petition for bankruptcy. *See* 11 U.S.C. § 547(b). In light of the court's holding, it is not necessary to address this issue.

153. While it is true that a fraudulent conveyance may occur under § 44-1004(A)(2)

154. *Gerow v. Covill,* 192 Ariz. 9, 960 P.2d 55, 63 (Ct.App.1998) (citations omitted).

155. Docket 112 at 21.

156. Docket 113, exh. 16, Deposition of James R. Clark, p. 214, lls. 11–18.

\*\*\*\*\*

Q: I have got the records and have talked with the trustee. I know you shorted the market. All the questions I have gone through is to try and find out what is the rationale? Why are you taking a position that's opposite to your customer's position? Why did you do that?

A: That is a good question. I wish I had a good answer.[157]

\*\*\*\*\*

A: All indicators were that the metals were soft and were going to stay soft, and I was a guy who was bearish on the market and have for quite some time.

Q: So you thought the price was going to go down?

A: I did yes. So I was taking a speculative position for the company.[158]

\*\*\*\*\*

Q: You mean you were in contracts other than precious metals, is that what you mean?

A: We were using other financial instruments to accomplish the same goals, meaning that historically speaking, as metals move up or down, the stock market has a tendency of moving the opposite direction. And you can see historical data where it is—many times it is often like clockwork that will happen. And then using the Standard & Poors Index as an instrument and a much larger size contract, about five times larger than the gold contracts or maybe six times larger than the silver contracts, we used those as an instrument to accomplish the same goal

And we would short the Standard & Poors Index, and for the interest we worked out we would lose money there also. The metals had turned soft and were soft until, I think it was February of '90. Metals hit a record low, and they moved up for the next two years. At the same time, the stock market was up to record highs.

So using that instrument of the Standard & Poors Indexes, we lost money in the Standard & Poors contract and gained money in the physical positions, the house position because it was turning soft, as metals stayed soft for most of that time, right up until February of '92, just four months before the bankruptcy.

We felt that was a pretty good vehicle and to use, and the liquidity was exceptionally good with that instrument where, you know, say, for instance, you had 100 Standard & Poors contracts and that was effectively like having 500 or 600 gold of silver positions on, and the liquidity for 100 of S & P contracts was far better liquidity for five or six hundred silver and gold contracts. So it gave us a lot more flexibility of being in and out of the market.[159]

\*\*\*\*\*

Q: I take it everyday you were attempting to do whatever made the best financial sense for Sheffield?

A: Yes.[160]

In other words, there is no direct evidence that Clark had an actual intent to hinder, delay or defraud any of Sheffield's creditors. To the contrary, the direct evidence shows that he was trying to act in Sheffield's best interest.

---

157. *Id.*, exh. 12, Testimony of James R. Clark, p. 88, l. 21 through p. 89 ¶ 4.

158. *Id.*, exh. 12, Testimony of James R. Clark, p. 89, l. 23 through p. 90, l. 5.

159. *Id.*, exh. 12, Testimony of James R. Clark, p. 90, l. 21 through p. 92, l. 5.

160. *Id.*, exh. 16, Deposition of James R. Clark, p. 186, ¶¶ 12–14.

Actual intent may also be proven by circumstantial evidence so long as it can be reasonably inferred from the evidence presented.[161] The statute suggests eleven factors which a court might use in considering whether actual intent existed. These factors include whether:

1. The transfer or obligation was to an insider.

2. The debtor retained possession or control of the property transferred after the transfer.

3. The transfer or obligation was disclosed or concealed.

4. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

5. The transfer was of substantially all of the debtor's assets.

6. The debtor absconded.

7. The debtor removed or concealed assets.

8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

10. The transfer occurred shortly before or shortly after a substantial debt was incurred.

11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[162]

These factors are referred to as the "badges of fraud."[163] Safrabank correctly points out that the evidence in the record can establish few, if any, of these factors.[164] Likewise, Trustee has not argued that any such "badges of fraud" exist.[165] Consequently, summary judgment is appropriate on count XI as to all payments Sheffield made to Safrabank for the purpose of purchasing borrowers' loans.

With respect to payments made on Sheffield's revolving line of credit, similar flaws exist. Trustee contends that his claim can be maintained because the borrowers' metals were being commingled with the metals securing Sheffield's revolving line and, therefore, any payments made on the line were in fraud of the borrowers.[166] Trustee's argument is unpersuasive because it does not touch upon the relevant inquiry. The issue is whether Sheffield made the payments on its revolving line with the "actual intent to hinder, delay or defraud" its creditors. As is discussed above, no direct or circumstantial evidence has been offered to that effect. The evidence demonstrates only that Sheffield always made timely payment on its revolving line, never defaulted[167], and always received value in exchange for those payments.[168] Consequently, summary judgment is appropriate as to the remainder of count XI. Because

---

161. *Gerow*, 960 P.2d at 63.

162. A.R.S. § 44–1004(B).

163. *Gerow*, 960 P.2d at 63.

164. Docket 106 at 35.

165. *See* docket 112 at 21.

166. *Id.*

167. Safrabank's SOF, ¶ 25 at 9.

168. Docket 106 at 37. Trustee does not dispute this fact. Moreover, there is direct testimony that Sheffield's own employees were unaware that anything was awry until the day Sheffield filed for bankruptcy. *See* docket 109, exh. HH, Deposition of Lana Jean Smith, p. 122, lls. 11–19; exh. l, Deposition of Scott Cameron, p. 31, ¶¶ 18–25.

count XII similarly relies on proof that Sheffield made revolving line payments with an "actual intent to hinder, delay or defraud" a creditor,[169] it necessarily follows that this claim must also fail.[170]

### 2. Preferential Transfers

■ Preferential transfers are characterized by five elements. The transfers must:

1. Be to or for the benefit of a creditor;

2. Be for or on account of an antecedent debt owed by the debtor before such transfer was made;

3. Be made while the debtor was insolvent

4. Be made within 90 days of the date of filing of the petition for bankruptcy or within a year of the petition if the creditor to whom the transfer was made was an insider at the time of the transfer; and

5. Have the effect of increasing the amount that the creditor would receive if the transfer had not been made and the debtor entered Chapter 7.[171]

An exception exists for secured creditors. A debtor cannot make a preferential transfer to a fully secured creditor.[172] Safrabank asserts this exception against Trustee's claim. Safrabank contends it was fully secured because the value of the collateral it held always exceeded the amount outstanding under Sheffield's revolving line.[173] Trustee contends that Safrabank's position is no more than an as-

sumption which, given "the nature of the relationship [between Sheffield and Safrabank] and the hopelessly commingled funds," is not necessarily true.[174] In other words, Trustee contends that, because the metals were commingled, the court cannot assume that Safrabank was fully secured.

Trustee's argument is unpersuasive. It is undisputed that Sheffield commingled the metals securing its borrowers' loans with the metals that secured its revolving line of credit. Nevertheless, the source of those metals is irrelevant with respect to the payments Sheffield made towards the amounts outstanding on its revolving line of credit. It is undisputed that Sheffield, at all times, had sufficient collateral pledged against its revolving line of credit. Safrabank was fully secured.

■ There exists an entirely independent reason for granting Safrabank summary judgment on Sheffield's claim. Under 11 U.S.C. § 547(c) an exception exists for transfers that are:

1. In payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and transferee;

2. Made in the ordinary course of business or financial affairs of the debtor and the transferee; and

3. Made according to ordinary business terms.[175]

It is well established above that the payments Sheffield made on its revolving line of credit satisfy these three requirements: the revolving line of credit Safrabank ex-

---

169. Third Amended Complaint, ¶ 128 at 22.

170. Because the court concludes that counts XI and XII must fail because Trustee has not demonstrated the requisite intent, the court does not reach Safrabank's "safe harbor" argument. *See* docket 106 at 37–39.

171. *See* 11 U.S.C. § 547(b).

172. *Powerine Oil Co. v. Koch Oil Co.,* 59 F.3d 969, 972 (9th Cir.1995).

173. Docket 106 at 41.

174. Docket 112 at 22.

175. 11 U.S.C. § 547(c)(2).

tended to Sheffield and the payments thereto that Sheffield made to Safrabank were within the ordinary business affairs of each and according to ordinary business terms. Consequently, the payments Sheffield made cannot be considered preferential transfers to Safrabank. It follows that summary judgment should be granted.

## V. CONCLUSION

For the above reasons, Safrabank's motion for summary judgment at docket 106 is **GRANTED.** This case is **DISMISSED.**