**RIVER COLONY ESTATES GENERAL PARTNERSHIP, et al.,**
Plaintiffs,

v.

**BAYVIEW FINANCIAL TRADING GROUP, INC., et al.,**
Defendants.

BFTG Holding Company, Inc., f/k/a Bayview Financial Trading Group, Inc., et al., Counter–Claimants,

v.

River Colony Estates General Partnership, et al., Counter–Defendants.

American Portfolio Mortgage Corporation, Counter–Claimants,

v.

River Colony Estates General Partnership, et al., Counter–Defendants,

No. 01–1420–IEG(LSP).

United States District Court,
S.D. California.

Aug. 22, 2003.

---

Peter R. Thompson, Thompson and Thompson, San Diego, CA, for Plaintiffs.

Laura D. Castner, Santa Monica, CA, Michelle A. Fongyee, Pedro J. Martinez–Fraga, Miami, FL, Grant Fortson, Law Vaughan Fortson McKenzie and Rowe, Little Rock, AR, for Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS BAYVIEW FINANCIAL TRADING GROUP, INC., BAYVIEW FINANCIAL TRADING GROUP, L.P., AND BFTG HOLDING COMPANY, INC. AGAINST ALL PLAINTIFFS**

GONZALEZ, District Judge.

Presently before the Court in the above-captioned matter is the motion of defendants Bayview Financial Trading Group, Inc., Bayview Financial Trading Group, L.P., and BFTG Holding Company, Inc.'s (collectively, "the Bayview defendants" or "Bayview") for summary judgment or partial summary judgment against all plaintiffs. For the reasons discussed below, the Court grants in part and denies in part Bayview's motion for summary judgment.

## I. Background

### A. Factual Background

This case arises out of the sale of River Colony, a 300–unit condominium complex located in the Mission Valley area of San Diego.

There are two classes of plaintiffs in this lawsuit: corporate plaintiffs and individual plaintiffs. The corporate plaintiffs are River Colony Estates General Partnership, River Colony (U.S.) Limited Partnership, and River Colony Management, Inc.[1] The individual plaintiffs are several hundred Canadian residents who invested in River Colony.

Kerry Dix ("Mr.Dix"), the promoter of the real estate venture, solicited the individual plaintiffs to invest in River Colony.[2] Mr. Dix gave investors the option of purchasing either (1) a share in River Colony Estates (Canada) Ltd. and limited partnership units in plaintiff River Colony Estates (U.S.) Limited Partnership, or (2) debentures in an entity that would loan money to River Colony (U.S.) Limited Partnership.[3] (Bayview App. 2 (August 30, 1996 Confidential Offering Memorandum ("COM")) at 44.)

The claims of the plaintiffs stem from the allegedly wrongful conduct of Mr. Dix in obligating them to loans bearing a higher rate of interest than they allegedly expected at the time they invested in the venture. Plaintiffs' expectations were allegedly based on a Confidential Offering Memorandum ("COM") dated August 30, 1996 that outlined the terms of the investment. Among other things, the COM stated that "[a] First Mortgage Loan *commitment* has been made by the U.S. Lender" and that "the Issuer *expects* that the following will be some of the salient provisions of the proposed First Mortgage" (emphasis added):

> Interest Rate: 6.9% per annum maximum for the initial year from the date of advance, the rate will be adjusted every 6 months after the initial Closing Date with a potential maximum adjustment upwards of 1% every 6 months. The maximum allowable adjustment being enacted would result

1. According to the Confidential Offering Memorandum ("COM"), River Colony Estates (Canada) Ltd. was the general partner of River Colony (U.S.) Limited Partnership.

2. Mr. Dix was the President and a director of River Colony Estates (Canada) Ltd., the President of Dix Development Ltd ("The Dix Group"), (COM at 68), the President and a director of River Colony Estates Capital Ltd.,

and the managing partner of River Colony Estates General Partnership. (COM at 69.)

3. After the sale of River Colony in August 2002, the debenture investors received the amounts to which they were contractually entitled. (Opp. at 1.) Thus, at the request of plaintiffs' attorney, the Court dismissed the 79 debenture investors on January 24, 2003. (Doc. No. 88.)

in a 8.56% average rate over the first 3 years. (COM at 116.)

The COM contained financial projections based on what it described as "major hypotheses" and warned prospective investors that because the projections were based on hypotheses, "there is a risk that actual results will vary, perhaps materially, from the results projected." (COM at 97.) Indeed, the "Risk Factors" section of the COM stated:

> The Issuer will use all reasonable efforts to arrange for the First Mortgage on the expected terms and rates disclosed herein. Subscribers should be aware that actual terms of such First Mortgage may vary therefore Subscribers may not derive the returns projected in this Offering Memorandum. (COM at 165.)

The COM also addressed risks inherent in real estate transactions including the "availability and cost of mortgage funds."[4] (COM at 164.) The COM further advised potential investors to seek legal, tax, accounting, or other professional advice. (COM at 2.)

Subsequent amendments were made to the COM on December 31, 1996 and April 29, 1997. Both of these amendments included an acknowledgment asking each investor to affirm that he or she had read and reviewed the amendments. All of the individual plaintiffs returned the acknowledgments to Mr. Dix. Neither of these amendments changed the interest rate or other financial terms of the COM.

The December 31, 1996 amendment to the COM included a Durable Special Power of Attorney ("DSPA"). The DSPA vested River Colony Estates (Canada) Ltd. and its officers and directors, such as Mr. Dix, with the authority to execute loan documents on behalf of the individual investors.[5] (Bayview App. 6 (DSPA).) The purpose of the DSPA was to remedy the logistical difficulties inherent in having 341 individuals, each of whom resided throughout Canada, execute loan and closing documentation on real estate located in San Diego. Each of the individual investors signed the DSPA.

Defendant American Portfolio Mortgage Corporation ("APM") brokers portfolios of mortgage loans. (Kessel Affid. ¶ 3.) In the Spring of 1997, the Dix Group contacted APM about purchasing a package of loans for the River Colony project. (Opp. to APM's Motion for Summary Judgment at 3.) This occurred after all of the individual plaintiffs had subscribed to invest in the project and after Mr. Dix obtained the DSPAs. (Kessel Affid. ¶ 12.) APM then contacted defendant Bayview Financial Trading Group ("Bayview"), with whom it had a long-standing relationship, to see whether it wanted to buy the loans; Bayview was interested and dictated its acceptable terms and purchase price to APM

---

4. In describing the risks of the investment, the COM stated:

> The purchase of Units involves certain risks and is not a suitable investment for all potential Subscribers...Investment in Units is suitable only for persons who have no need for liquidity to the extent of their investment therein, who are in a position to evaluate the prospective investment on the basis of this Offering Memorandum and such other information as is furnished to them, and who are able to bear the risk of the loss of their entire investment. (COM at 108.)

5. The DSPA authorized the officers and directors to:

> [S]ign, acknowledge, deliver, record and/or file as and where required any promissory note, deed of trust, disclosure statements, acknowledgments and other documents and instruments necessary to obtain a first-priority mortgage loan secured by the Designated Units, and any extension or renewal thereof or replacement therefor, without the specific approval of the Principal. (DSPA at 327.)

who conveyed those terms to the Dix Group.

On or about May 29, 1997, APM and the Dix Group entered into an agreement for APM to buy the loans. In contrast to the rates set forth in the COM, the purchase price and terms letter between APM and The Dix Group stated that the interest rate would be:

> Fixed for three (3) years at 9%, then adjusting every 6 months to LIBOR plus 325 basis points. Caps 1% per adjustment max, 2% per year adjustment max, 6% life of loan maximum. (Bayview App. 8 at 345.)

In addition, the terms included a 3% prepayment penalty for the first three years of the loan. *Id.*

On May 30, 1997 Bayview purchased the entire portfolio of loans from APM pursuant to the terms described above. The gross profit to APM was the difference between the price paid by defendant Bayview to APM and the price paid by APM to the Dix Group, less certain fees and expenses. (Vorreyer Affid.)

Between June 21 and June 27, 1997, Bayview's lawyers in conjunction with Mr. Dix's attorneys drafted an amendment to the COM dated May 31, 1997 ("the May 31, 1997 amendment"). The amendment, among other things, set forth the new terms of the loan, including the change in interest rate from 6.9% to 9.0%.

On June 30, 1997, Mr. Dix signed an "Officer's Certificate" stating that the individual investors had approved of the changes in the financial terms as set forth in the May 31, 1997 amendment:

> [E]ach of the parties named in Schedule "A" attached hereto (who represent all

of the purchasers of securities described in the Offering Memorandum in respect of the Closing to which this Officers' Certificate is being delivered) have confirmed their respective subscriptions for such securities as a result of having received any and all amendments to the Offering Memorandum. (Bayview App. 21 (Officer's Certificate at 533).)

Ernest Hee ("Mr.Hee"), Mr. Dix's attorney, sent the officer's certificate to Bayview's attorney Laura Gangemi ("Ms.Gangemi") via telefax on July 2, 1997. (*Id.* at 534.) [6]

On July 3, 1997 the River Colony transaction closed on loans worth over $28 million at a 9% interest rate. APM's attorney Gary Consentino drafted the loan documents, which set forth the 9% interest rate. (Plaintiffs' Supp.App. 2, Kessel Depo. at 13–15.) APM received $373,387 for its work on the River Colony project and may have also benefitted from doing business with Bayview, its long-time business associate. (Plaintiffs' Supp.App. 2, Kessel Depo. at 11.)

Plaintiffs assert that the Bayview defendants received several financial benefits from the River Colony transaction: (1) interest on a $28 million loan at two points over the market rate; (2) a 3% pre-payment penalty; and (3) 4.5 points. (Opp. p. 10 n. 15.)

After the loans closed, Bayview attorneys edited and executed an "Acknowledgment Agreement." Mr. Dix's counsel drafted the original version which it faxed to Kathy Wade, one of Bayview's attorneys, on July 2, 1997. (Plaintiffs' App. 11.)

---

**6.** Plaintiffs challenge the validity of the officer's certificate. The final version of the May 31, 1997 amendment was drafted on Saturday, June 28, 1997, whereas Mr. Dix executed the officer's certificate on Monday, June 30, 1997. Plaintiffs argue that it is unreasonable

to believe that all 341 investors, who resided throughout Canada, could have received, reviewed, and approved the amendment in two days, especially since one of the days was a Sunday.

The acknowledgment agreement stated that APM made the loans and that Bayview would purchase the loans from APM.[7] It further stated that:

> (the "Subscriber") has subscribed for unit(s) under that certain [COM] dated August 30, 1996, as amended by amendments dated December 31, 1996, April 29, 1997 and May 31, 1997 (the "Offering Memorandum") relating to the River Colony Estates Condominium Project...
>
> Therefore, the Subscriber hereby acknowledges, understands and agrees that:
>
> 1. The Lenders played no role in the preparation, distribution or promotion of the Offering Memorandum or in the negotiation or implementation of the investment vehicle described or promoted therein. (Bayview App. 15 at 495.)

Although the acknowledgment agreement asked each investor to acknowledge that he or she received the May 31, 1997 amendment, it neither attached the May 31 amendment nor disclosed the increased interest rate. The acknowledgment agreement appears to have been sent to investors in July 1997. (*See, e.g.*, Bayview App. 15 (Copy of acknowledgment agreement signed by investor Herve Faucher on July 24, 1997).)

Mr. Dix committed suicide in October 1997. Three of the individual investors-Herve Faucher, Eugene Turris, and John Steeves-were subsequently elected as directors of the corporate plaintiffs. After their election, Faucher, Turris, and Steeves obtained the agreement of the corporate plaintiffs to receive compensation in the form of contingency fees equal to ten percent of all monies that they caused to be returned to plaintiffs. (*See, e.g.*, Bayview App. 5, Faucher Depo. at 249.)

### B. Procedural Background

Plaintiffs initiated their suit by filing a complaint in San Diego Superior Court on February 26, 2001. Plaintiffs filed a first amended complaint ("FAC") on June 29, 2001. The FAC seeks damages for (1) rescission and unilateral mistake of fact; (2) negligence; (3) conspiracy to breach fiduciary duty; (4) aiding and abetting breach of fiduciary duty; (5) conspiracy to commit fraud; (6) aiding and abetting fraud; (7) conversion; and (8) unfair business practices.[8]

Defendants removed the action to federal court on August 2, 2001. (Doc. Nos. 1, 5.) On December 17, 2001, defendants filed a motion to transfer venue to the Southern District of Florida (Doc. No. 16), which the Court denied on January 4, 2002. (Doc. No. 33.)

On April 24, 2002, the Bayview defendants filed a motion for summary judgment. (Doc. No. 40.) In response, plaintiffs filed an *ex parte* application to

---

7. The agreement stated:

"...[A]n independent U.S. lender, [APM] has made a loan to the Subscriber in the amount of seventy-five percent (75%) of the applicable purchase price of the Condo Unit (the "Loan"), the proceeds of which loan were used to purchase the Condo Unit from the General Partnership, and which loan has been evidenced by a note...in the amount of the Loan and has been secured by a first priority deed of Trust...on the Condo Unit. The Subscriber also acknowledges and understands that [APM] intends to sell and/or transfer the Loan so that it will be held by Bayview Financial Trading Group Inc. ("Bayview"), its successors and/or assigns (hereinafter [APM], Bayview and their respective successors and/or assigns will be collectively referred to as the "Lenders")." (Bayview App. 15 at 495.)

8. The Court granted defendants' motion for summary judgment on plaintiffs' first cause of action for rescission on August 12, 2003. (Doc. No. 145.) The plaintiffs did not oppose defendants' motion. (Doc. No. 123.)

continue the motion to allow discovery to occur. (Doc. No. 47.) On May 20, 2002, the Court granted plaintiffs' *ex parte* application to continue defendants' motion for summary judgment and dismissed defendants' motion for summary judgment without prejudice. (Doc. No. 50.)

The Bayview defendants filed the instant motion on April 29, 2003. (Doc. No. 98.) The Court took the motion under submission on July 10, 2003. (Doc. No. 128.)

## II. DISCUSSION

### A. Legal Standard

Summary judgment is proper where "there is no genuine issue as to any material fact and...the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A material issue of fact is a question that a jury must answer to determine the rights of the parties under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Act Up!/Portland v. Bagley,* 988 F.2d 868, 873 (9th Cir.1993). A dispute is "genuine" only if "a jury applying [the substantive law's] evidentiary standard could reasonably find for either the plaintiff or the defendant." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

In considering a motion for summary judgment, the Court must examine all the evidence in the light most favorable to, and make all references in favor of, the non-moving party. *Id.; United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The moving party bears "the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

To satisfy this burden, the moving party must demonstrate that no genuine issue of material fact exists for trial. *Id.* at 322,

106 S.Ct. 2548. However, the moving party is not required to negate those portions of the non-moving party's claim on which the non-moving party bears the burden of proof. *Id.* at 323, 106 S.Ct. 2548.

Once the moving party demonstrates that there is no genuine issue of material fact, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). The facts relied upon must be admissible under the rules governing the admission of evidence generally, including those concerning authentication, relevance, and hearsay. *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1550–52 (9th Cir. 1989). Conclusory allegations as to ultimate facts are not adequate to defeat summary judgment. *Hansen v. United States,* 7 F.3d 137, 138 (9th Cir.1993).

### B. Analysis

#### 1. Timeliness of Counts II, V, VI, VII and VIII

█ The Bayview defendants contend that the relevant statutes of limitation preclude the plaintiffs' claims for negligence (Count II), conspiracy to commit fraud (Count V), aiding and abetting fraud (Count VI), and conversion (Count VII). For the reasons discussed below, the Court grants Bayview's motion on this ground.

The statute of limitations for claims for fraud, conspiracy to commit fraud, aiding and abetting fraud, and conversion is three years. Cal.Civ.Proc.Code § 338(d) (West 2003) (stating that the statute of limitations for fraud and conspiracy to commit fraud is three years); § 338(c) (stating that the statute of limitations for conversion is three years); *Aaroe v. First American Title Ins. Co.,* 222 Cal.App.3d 124, 128, 271 Cal.Rptr. 434 (1990) (applying § 338(d) to conspiracy to defraud cases). The stat-

ute of limitations for negligence is two years. Cal.Civ.Proc.Code § 339 (West 2003).

■ A plaintiff must bring a cause of action within the limitations period after accrual of the cause of action. *See, e.g., Norgart v. Upjohn Co.*, 21 Cal.4th 383, 384, 87 Cal.Rptr.2d 453, 981 P.2d 79 (1999). Courts generally define accrual to occur when the cause of action is complete with all of its elements. *Id.*

■ An exception is the discovery rule; under the discovery rule, courts postpone accrual of a cause of action until the plaintiff discovers, or has reason to discover the cause of action. *Id.* A plaintiff discovers the cause of action when the plaintiff at least suspects a factual basis-as opposed to a legal theory-for its elements even if the plaintiff lacks knowledge thereof. *Id.* at 397, 87 Cal.Rptr.2d 453, 981 P.2d 79. In other words, a plaintiff discovers a cause of action when he or she at a minimum "suspects...that someone has done something wrong" to him or her, "wrong" being used in its lay understanding. *Id.* at 397–98, 87 Cal.Rptr.2d 453, 981 P.2d 79 (quoting *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110 n. 7, 245 Cal.Rptr. 658, 751 P.2d 923 (1988)). A plaintiff has reason to discover the cause of action when the plaintiff has reason to suspect a factual basis for its elements. *Id.* at 398, 87 Cal.Rptr.2d 453, 981 P.2d 79 (citing *Jolly*, 44 Cal.3d at 1110, 245 Cal. Rptr. 658, 751 P.2d 923). A plaintiff has reason to suspect when a plaintiff has notice or information of circumstances to put a reasonable person on inquiry. *Id.* (citing *Jolly*, 44 Cal.3d at 1110–11, 245 Cal.Rptr. 658, 751 P.2d 923). A plaintiff need not know the specific facts necessary to establish the cause of action; instead, plaintiff can seek to learn these facts through pretrial discovery. *Id.* However, a plaintiff must attempt to learn the facts needed to bring the cause of action; a plaintiff cannot wait for the facts to find the plaintiff

while the plaintiff sits on his or her rights. *Id.* If a plaintiff finds the relevant facts, the plaintiff must file suit within the limitations period. *Id.*

Bayview contends that plaintiffs' claims are stale based on plaintiffs' alleged admission that they were aware of the circumstances which form the basis of all of their claims as early as July 1997, as evidenced by their FAC which states: "[o]n or after July 1997, plaintiffs discovered the circumstances under which the loan documents were executed and the consequences of the changes in terms and conditions." (FAC ¶ 22.) Accordingly, Bayview argues that by the time plaintiffs filed suit on February 21, 2001, their claims were already stale.

Plaintiffs respond, and the Court agrees, that this admission is not dispositive since by its terms it leaves open the possibility that the plaintiffs did not discover the relevant circumstances until after July 1997. There is other evidence, however, that by July 1997 plaintiffs were aware of facts that would put a reasonable person on notice that someone had done something wrong to him or her. By July 1997, plaintiffs knew that the interest rate on the first mortgage was 9.0%, not 6.9% as set forth in the COM. (*See, e.g.,* Bayview App. 5, Faucher Depo. at 277; Bayview App. 24 at 555:25–556:6 (Response to Interrogatory No. 10 stating that Mr. Turris received the 5/31/97 amendment on July 4, 1997.)) Plaintiffs knew, moreover, that APM and Bayview were involved in the transaction. (*See, e.g.,* Opp. at 11–12; Opp. to APM's Motion for Summary Judgment at 15.) Thus, the Court finds that under California law, the cause of actions in this case had accrued by mid-July 1997, even if plaintiff did not know the specific facts necessary to establish the cause of action. Accordingly, the Court finds that plaintiff's claims are now time-barred.

■ Although plaintiffs admit that they knew of the changed terms and the entities involved in the loan by mid-July 1997, plaintiffs argue that they were unaware of Bayview's involvement in the alleged fraudulent concealment until June 2000 and that the Court, accordingly, should toll the statute of limitations under the doctrine of fraudulent concealment. (Opp.14) This argument fails for the reasons discussed below.

■ Courts toll the statute of limitations in cases in which a plaintiff demonstrates that a defendant fraudulently concealed facts which would have led the plaintiff to discover his or her potential cause of action. *Snow v. A.H. Robins Co., Inc.*, 165 Cal.App.3d 120, 127–28, 211 Cal. Rptr. 271 (1985) (citing *Pashley v. Pacific Electric Railway Co.*, 25 Cal.2d 226, 231–32, 153 P.2d 325 (1944)). To establish fraudulent concealment a complaint must show: (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of fact sufficient to put him on inquiry notice. *Conerly v. Westinghouse Electric Corp.*, 623 F.2d 117, 120 (9th Cir.1980)(citing *Baker v. Beech Aircraft Corp.*, 39 Cal. App.3d 315, 321, 114 Cal.Rptr. 171 (1974)). As with any fraud cause of action, a plaintiff must allege the specific facts constituting the fraud. *Community Cause v. Boatwright*, 124 Cal.App.3d 888, 901, 177 Cal. Rptr. 657 (1981).

■ Courts have extended the reach of the tolling the statute of limitations on causes of action beyond fraud-based claims; courts will toll the limitations period on other causes of action affected by the concealment. *See, e.g., Snapp & Associates Insurance Services, Inc. v. Robertson*, 96 Cal.App.4th 884, 890, 117 Cal. Rptr.2d 331 (2002). Moreover, in *Bernson v. Browning–Ferris Industries of California*, 7 Cal.4th 926, 30 Cal.Rptr.2d 440, 873 P.2d 613 (1994), the California Supreme Court held that a defendant may be equitably estopped from asserting the statute of limitations when, as a result of intentional concealment, the plaintiff cannot discover the identity of the defendant. *Id.* at 936, 30 Cal.Rptr.2d 440, 873 P.2d 613.

■ In order for a court to apply the doctrine, however, a plaintiff must exercise reasonable diligence in identifying the defendant; under the holding in *Bernson*, the statute will toll only until the plaintiff knows, or through the use of reasonable diligence should have discovered, the defendant's identity. *Id.* at 936, 30 Cal. Rptr.2d 440, 873 P.2d 613. In determining whether a plaintiff acted with reasonable diligence, courts must consider whether the filing of a timely "Doe" complaint would have facilitated the discovery of the defendant's identity. *Id.* at 937, 30 Cal. Rptr.2d 440, 873 P.2d 613. If one defendant is known, the plaintiff must file a timely complaint naming Doe defendants and take discovery; however, if "the facts are such that even discovery cannot pierce a defendant's intentional efforts to conceal his identity, the plaintiff should not be penalized." *Id.* The *Bernson* court emphasized that its holding would affect only a tiny fraction of civil cases, noting that it will be the "rare and exceptional case in which the plaintiff could genuinely claim that [he or she] was aware of no defendants, and even more rare that, given the knowledge of at least one, [plaintiff] could not readily discover the remainder through the filing of a Doe complaint and the normal discovery processes." *Id.*

Under plaintiffs' theory, the Court should toll the statute of limitations due to the Bayview defendants' fraudulent concealment of its role to increase the interest rate and close the River Colony loans without the knowledge and consent of the in-

vestors. Plaintiffs claim that the Bayview defendants, in conjunction with APM, drafted the loan documents which changed the interest rate knowing that the investors were unaware of the change. Moreover, by participating in the drafting of the acknowledgment agreement, APM and Bayview allegedly misled investors by stating that they had no involvement in the preparation of the COM even though they drafted the May 31, 1997 amendment. Plaintiffs emphasize that they had never heard Bayview's name prior to the receipt of the acknowledgment agreement in July 1997 which only stated that they were lenders.

Furthermore, plaintiffs assert that they were diligent in filing suit against the defendants upon discovery of the concealment. Plaintiffs contend that they learned of the Bayview defendants' involvement on July 6, 2000, when they allegedly received documents revealing Bayview and APM's involvement in drafting the May 31, 1997 amendment. (Plaintiffs' App. 15 (July 6, 2000 correspondence)). To support their contention, plaintiffs offer the July 6, 2000 letter from defendants' attorney but not the documents which were enclosed with the letter.[9] Plaintiffs argue that after learning of the Bayview defendants' involvement, they filed suit against these defendants less than one year later on February 26, 2001.

The Court finds that in the instant case the facts do not justify tolling the statute of limitations. First, plaintiffs do not meet their burden of alleging facts to support fraudulent concealment. Plaintiffs' thirteen-page FAC does not set forth when the fraud was discovered, the circumstances under which it was discovered, nor that the plaintiffs were not at fault for failing to discover it. Thus, the complaint does not plead fraudulent concealment as required for the Court to apply the doctrine.

Second, the Court finds that even if plaintiffs' complaint meets the pleading requirements of fraudulent concealment, plaintiffs have failed to demonstrate that they exercised due diligence in identifying the appropriate defendants as required by *Bernson.* In this case, plaintiffs have not shown why the timely filing of a Doe complaint would not have facilitated identifying the defendants. Indeed, prior to filing suit against the Bayview defendants, plaintiffs filed suit against other parties related to the River Colony transaction, such as Chicago Title Insurance Company. As discussed above, by mid-July of 1997 plaintiffs knew that APM and Bayview were involved in the transaction and that the interest rate was higher than the plaintiffs had initially expected, even if plaintiffs were unaware of defendants' alleged fraudulent concealment of the higher interest rate. (*See, e.g.,* Opp. at 11–12; Opp. to APM's Motion for Summary Judgment at 15.) Given that the plaintiffs had identified other defendants and were aware that the Bayview defendants were involved in the transaction, it is likely that discovery could have revealed defendants' intentional efforts to conceal their identity. Plaintiffs have not shown that this is one of the "rare and exceptional" cases in which a plaintiff could not readily identify the defendants after filing a Doe complaint and

---

**9.** The letter states:
Enclosed are documents within the purview of the deposition *duces tecum* pursuant to which Mr. Tom Carr was deposed as Bayview Financial Trading Group's records custodian on June 30, 2000. Regrettably, these documents were inadvertently omit-
ted from the production. I trust that the now comprehensive production of all documents elicited except for those falling within the ambit of the attorney-client privilege or work product doctrine has not caused any prejudice to the parties or Court.

conducting normal discovery. Indeed, it was through discovery in a related case, *River Colony v. Hecht Solberg et al.,* that plaintiffs identified APM and Bayview as defendants. (Opp. to APM's Motion for Summary Judgment at 15.)

Accordingly, the Court grants Bayview's motion for summary judgment as to plaintiffs' claims for negligence (Count II), conspiracy to commit fraud (Count V), aiding and abetting fraud (Count VI), and conversion (Count VII) because these claims are time-barred. In addition, although not raised by the Bayview defendants, the statute of limitations under the Unfair Business Practices Act, § 17000 *et seq.* is also three years after the cause of action accrues. Cal.Code Civ. P. §§ 338(a), 312 (West 2003). The Court, therefore, likewise grants Bayview's motion for summary judgment as to Count VIII.

This leaves plaintiffs' claims for conspiracy to breach fiduciary duty (Count III) and aiding and abetting breach of fiduciary duty (Count IV).

### 2. Duty of Care and Conspiracy to Breach Fiduciary Duty Claim

■ The Bayview defendants next argue that plaintiffs' negligence claim fails because Bayview owed plaintiffs no duty of care. Although the Court need not address duty of care as it relates to negligence since it has determined the statute of limitations bars plaintiffs' negligence claim, duty of care is an element of conspiracy to breach fiduciary duty. The Court, accordingly, addresses the issue and finds that Bayview owed plaintiffs no duty of care.

■ Tort liability for conspiracy cannot exist unless the alleged co-conspirator is legally capable of committing the tort; in other words, the co-conspirator must owe a duty to the plaintiff. *Everest Investors 8 v. Whitehall Real Estate Limited Partnership,* 100 Cal.App.4th 1102, 1106–1107, 123

Cal.Rptr.2d 297 (2002). A lender does not owe a borrower or third party any duties "beyond those expressed in the loan agreement, excepting those imposed due to special circumstance or a finding that a joint venture exists." *See, e.g., Resolution Trust Corporation v. BVS Development, Inc.,* 42 F.3d 1206, 1214 (9th Cir.1994)(citing *Nymark v. Heart Federal Savings & Loan Association,* 231 Cal.App.3d 1089, 1096, 283 Cal.Rptr. 53 (1991)).

A special relationship might exist where a bank, through a loan agreement, can control a borrower. *See, e.g., Hashimoto v. Clark,* 264 B.R. 585, 594–95 (D.Ariz. 2001) (applying California law and citing *Kim v. Sumitomo Bank of California,* 17 Cal.App.4th 974, 979–80, 21 Cal.Rptr.2d 834 (1993); *Niederreuther v. Schifter,* 1998 WL 409876 (N.D.Cal. July 14, 1998)). *See also Resolution Trust Corporation,* 42 F.3d at 1214 ("Only under extraordinary circumstances in which a lender plays an instigating or active role in a development project will a duty to subordinated sellers be imposed.") Alternatively, a special relationship might exist if a bank offers any provision of trust or fiduciary services, or otherwise agrees to serve as a financial advisor. *Peterson Development Co. v. Torrey Pines Bank,* 233 Cal.App.3d 103, 119, 284 Cal.Rptr. 367 (1991).

Here, plaintiffs contend that the Bayview defendants "owed a duty of care to Plaintiffs to advise Plaintiffs of the substantial and material differences in the terms and conditions of the loan documents that were being signed and /or obtain the consent of the Plaintiffs before agreeing to fund the loans or allow Kerry Dix to sign the loan documents."

Moreover, plaintiffs assert that special circumstances exist because the Bayview defendants participated in the enterprise beyond the usual domain of a money lender. Plaintiffs buttress this argument by

asserting that Bayview (1) participated in the drafting of the May 31, 1997 amendment that materially altered the terms of the COM; (2) knew about the DSPA and expressed concern about Mr. Dix's potential misuse of the DSPA; (3) accepted (and now rely upon) the officer's certificate; (4) closed the loan on July 3, 1997, despite knowledge that the individual investors were not aware of the change in interest rate and other financial terms; (5) participated in drafting the acknowledgment agreement to the individual investors "to secure their after-the-fact 'agreement' to the new interest rate and other terms"; and (6) misrepresented in the acknowledgment agreement its involvement in the preparation of the May 31, 1997 amendment and its role in dictating the changed terms of the COM.

Even assuming that all of the above facts are true (and Bayview disputes several of them), these facts do not support the finding that a special relationship exists under California law. These facts do not in any way suggest that the Bayview defendants exercised control over plaintiffs, nor that they offered provision of trust or fiduciary services or agreed to serve as a financial advisor. Bayview, moreover, did not play an extraordinarily active or instigating role which would justify viewing it as more than a lender in the River Colony project.[10]

Accordingly, the Court finds that the Bayview defendants owed no duty of care to plaintiffs as a matter of law and thus cannot be liable for conspiracy to breach fiduciary duty. The Court, therefore, grants Bayview summary judgment on Count III. This leaves plaintiffs' claim that the Bayview defendants aided and abetted Mr. Dix's breach of fiduciary duty.

*3. Evidence Supporting Aiding and Abetting Claims*

 The Bayview defendants next contend that plaintiffs cannot prove their key allegations regarding aiding and abetting. First, Bayview alleges that plaintiffs cannot prove that the Bayview defendants knew that the individual investors were unaware of the alleged change in the interest rates of the loans. Second, Bayview asserts that plaintiffs have no evidence of any conspiracy or nefarious agreement between Mr. Dix and the Bayview defendants. For the reasons discussed below, the Court denies the Bayview defendants' motion on these grounds; the Court finds that the plaintiffs have raised triable issues of fact.

 . A party can be liable for aiding and abetting an intentional tort if (1) an individual is aware that the other's conduct constitutes a breach of duty and provides substantial assistance or encouragement to the other to so act; or (2) if an individual gives substantial assistance to another in accomplishing a tortious result and the individual's own conduct, when separately considered, constitutes a breach of duty to a third person. *See, e.g., Hashimoto*, 264 B.R. at 598 (citing *Saunders v. Superior Court*, 27 Cal.App.4th 832, 845–46, 33 Cal. Rptr.2d 438 (1994)). To establish liability for aiding and abetting, plaintiffs must prove: (1) the fact of perpetration of the overall improper scheme; (2) the aider and abettor's knowledge of such a scheme; and (3) the aider and abettor's substantial assistance furthered the scheme. *Harmsen v. Smith*, 693 F.2d 932, 943 (9th Cir.1982).

The parties agree that the "linchpin" of each of the plaintiffs' claims against the

**10.** The Court notes, moreover, that Bayview purchased the portfolio of loans from APM and was not a signatory to any of the loans at issue; thus it is not clear that Bayview was even a "lender" on the transaction.

Bayview defendants is found in paragraph thirteen of the FAC which states: ·

Plaintiffs are informed and believe that defendants herein were aware prior to funding that the loan documents varied substantially and materially from the terms set forth in the [COM] and that Plaintiffs were not notified of the changes or variance.

The Bayview defendants contend that there is no evidence demonstrating that Bayview knew, prior to funding on July 3, 1997, that the investors were not aware that the interest rates had changed from the terms as stated in the COM.

In response, plaintiffs present evidence that raises a material issue of fact as to whether Bayview knew that the loan terms were materially different from the COM. For example, plaintiffs present evidence that Ms. Gangemi, one of Bayview's attorneys, received Bayview's Term Sheets for the loans from Michael Sorenson, Bayview's general counsel, on June 21, 1997. In response to the changes in the loan terms, Gangemi appears to have recommended: (1) that the investors be apprised of the change in the interest rate and other terms; (2) that the COM be amended to reflect the increased interest rate; and (3) that the investors consent in writing to the changed terms. (Plaintiffs' App. 1.)

Further, plaintiffs present evidence that suggests that there was no reasonable basis for Bayview to rely on the officer's certificate and that Bayview may have known that the officer's certificate was false. The officer's certificate, which confirmed that the individual investors' agreed to the terms of the May 31, 1997 amendment, was executed by Mr. Dix on June 30, 1997, and received by Ms. Gangemi on July 2, 1997. Plaintiffs contend, and the Court agrees, that it is not reasonable to believe that all 341 investors, who resided throughout Canada, could have received, reviewed, and approved the amendment in two days, especially since one of those days was a Sunday. The Court finds that this evidence creates a triable issue of fact and therefore denies the Bayview defendants' motion for summary judgment on this ground.

Second, the Bayview defendants assert that plaintiffs have no evidence of any conspiracy or nefarious agreement between Mr. Dix and the Bayview defendants. The Court likewise finds that plaintiffs have presented evidence which raises a triable issue of fact.

To support their conspiracy claim, plaintiffs submit evidence that suggests that (1) Bayview knew that the loan terms were materially different than those set forth in the COM. (Plaintiffs' App. 1); (2) Bayview may have known that the DSPA did not provide Mr. Dix with the power to change the terms and conditions of the COM and that an amendment was needed (Plaintiffs' App. 2); (3) Bayview's counsel, in conjunction with Mr. Dix's attorney, drafted the May 31, 1997 amendment to the COM (Plaintiffs' App. 4); (4) Mr. Dix's lawyer faxed the May 31, 1997 amendment to Bayview's general counsel on June 28, 1997 (Plaintiffs' App. 7); (5) Bayview relied on the officer's certificate which was executed by Mr. Dix on Monday, June 30, 1997, stating that all of the individual investors had reviewed and approved the May 31 amendment (Bayview Memo. at 19); (6) the attorneys for Bayview and Mr. Dix who drafted the May 31 amendment deleted the section of the amendment where the investors acknowledged that they had received and reviewed the amendment that had appeared in the previous amendments to the COM (Bayview App. 10); (7) Bayview may have suspected that written consent was needed to materially alter the terms of the COM (Plaintiffs' App. 1, 3); (8) perhaps in an effort to

"cover its tracks," Bayview's counsel in conjunction with Mr. Dix's counsel drafted the acknowledgment agreement after the close of escrow and after the investors were bound to the 9% interest rate; in the agreement, Bayview may have misrepresented its involvement in altering the terms of the COM; (9) Bayview relied on an opinion letter prepared by Mr. Dix's counsel containing information Bayview may have known to be false to allegedly defraud the individual investors with Mr. Dix.

In sum, the Court finds that plaintiffs have raised a triable issue of fact of a conspiracy or agreement between Bayview defendants and Mr. Dix to defraud the individual plaintiffs. Plaintiffs, moreover, have presented evidence that raises a triable issue of fact as to the perpetration of the overall scheme, Bayview's knowledge of such a scheme, and its substantial assistance in furtherance of the scheme. The Court, accordingly, denies Bayview's motion for summary judgment with respect to this issue.

### 4. Agency and Unclean Hands

■ The Bayview defendants argue that agency law and the doctrine of unclean hands preclude the corporate plaintiffs' claims. For the reasons discussed below, the Court denies Bayview's motion for summary judgment on these grounds.

■ Under the doctrine of imputed knowledge a principal is chargeable with and is bound by the knowledge or notice received by his or her agent while the agent is acting within the scope of his or her authority. *See, e.g., Columbia Pictures Corp. v. DeToth*, 87 Cal.App.2d 620, 630, 197 P.2d 580 (1948). The law imputes the knowledge to the principal, regardless of whether the agent actually communicates the knowledge to the principal. *Id.* The principal, furthermore, is bound by the fraudulent or negligent acts of its agents acting within the scope of employment; notice of these wrongful acts is likewise imputed to the principal. *See, e.g., Pitman v. Walker*, 187 Cal. 667, 670, 203 P. 739 (1922).

■ The purpose of the rule is to protect third parties who deal with an agent by allowing the third parties to assume that the agent will faithfully communicate with his or her principal. The intention of the rule, however, is only to protect agents acting in good faith; it is not a shield for unfair dealings. *See, e.g., Sands v. Eagle Oil & Refining Co.*, 83 Cal.App.2d 312, 319–20, 188 P.2d 782 (1948). Accordingly, there are two exceptions to the general rule of imputed knowledge. *Id.* at 319, 188 P.2d 782. First, courts make an exception if an agent and a third party act in collusion against the principal. *Id.* Second, courts will not apply the general rule when the third party knows that the agent will not advise the principal. *Id.*

Courts, furthermore, will not impute an agent's actions to his or her principal when the agent's action is adverse to the principal. *Meyer v. Glenmoor Homes, Inc.*, 246 Cal.App.2d 242, 264, 55 Cal.Rptr. 502 (1966). Courts have held that an agent behaves in a manner adverse to his or her principal when the agent colludes with third parties to defraud the principals. *Sands*, 83 Cal.App.2d at 319–20, 188 P.2d 782.

Bayview contends that because Mr. Dix, whom plaintiffs accuse of soliciting their investments and then wrongfully and fraudulently executing loan agreements with terms materially different from the COM, was an officer or agent of the corporate plaintiffs, the Court must impute knowledge of his acts to the corporate plaintiffs. Moreover, the Bayview defendants assert that because the Court must impute knowledge of the changes to the

COM to the corporate plaintiffs, the corporate plaintiffs' claims are barred.

The Court, however, cannot rule as a matter of law that the law of agency and the doctrine of unclean hands preclude plaintiffs' claims. Here, plaintiffs have presented evidence, discussed in the previous section, that raises a triable issue of fact as to whether Mr. Dix and Bayview colluded against the principal, whether Bayview knew that Mr. Dix would not inform the plaintiffs, and whether Mr. Dix was acting in a manner adverse to the interest of the corporate plaintiffs. Accordingly, the Court denies Bayview's motion for summary judgment on these grounds.

### 5. Dismissal of Bayview Financial Trading Group, L.P.

▉ The Bayview defendants argue that Bayview Financial Trading Group, L.P. was neither involved in, nor even in existence at the time of the loan transactions at issue. Accordingly, Bayview argues that the Court should dismiss Bayview Financial Trading Group, L.P.

▉ Courts recognize a public policy disfavoring the treatment of companies owned by the same individuals as a single or unitary enterprise and if these individuals "assert their corporate separateness in order to commit frauds and misdeeds with impunity." *Las Palmas Associates v. Las Palmas Center Associates*, 235 Cal.App.3d 1220, 1249, 1 Cal.Rptr.2d 301 (1991). Courts will find that one corporation is the alter ego of another when there is a unity of interest and ownership and adherence to the fiction of a separate existence of the two corporations would promote injustice. *See, e.g., Pan Pacific Sash & Door Co. v. Greendale Park, Inc.*, 166 Cal.App.2d 652, 658–59, 333 P.2d 802 (1958); *Gordon v. Aztec Brewing Co.*, 33 Cal.2d 514, 523, 203 P.2d 522 (1949) (finding that it was proper for a court to instruct the jury that a corporation was the alter ego of a partnership where the corporation transferred all of its property to a newly formed partnership for tax reasons, but continued to conduct business under the same name, manner, and with the same stock holders as a partnership with the same proportional interests).

In the instant case, plaintiffs present evidence that raises a triable issue of fact as to whether Bayview Financial Trading Group, L.P. is the successor in interest to Bayview Financial Trading Group, Inc., and therefore is liable for the acts of its predecessor. Plaintiffs cite the testimony of David Ertel ("Mr.Ertel"), the managing director and then co-CEO of Bayview Financial Trading Group, Inc., which was later renamed BFTG Holding Company, Inc., stating that he and Nancy Hector ("Ms.Hector") were equal shareholders in Bayview Financial Trading Group, Inc. Subsequently, Bayview Financial Trading Group was formed. After the name change to BFTG Holding Company, Mr. Ertel and Ms. Hector continued to be co-owners of BFTG Holding Company Inc. In addition, BFTG Holding Company Inc. owns more than a 50% limited partnership interest in Bayview Financial Trading Group, L.P. and does not engage in any business besides owning its partnership shares. Moreover, Bayview Financial Trading Group, Inc./BFTG Holding Company, Inc. contributed substantially all of its business to the formation of Bayview Financial Trading Group, L.P. Accordingly, the Court denies Bayview's motion for summary judgment on this issue.

### CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** Bayview's motion for summary judgment. The Court **GRANTS** summary judgment as to Counts II, III, V, VI, VII,

and VIII. The Court **DENIES** Bayview's motion for summary judgment based on plaintiffs' alleged inability to prove their key allegations and the doctrine of unclean hands. Lastly, the Court **DENIES** Bayview's request for the dismissal of Bayview Financial Trading Group, L.P. The Court notes that plaintiffs' only remaining claim against the Bayview defendants is the claim for aiding and abetting breach of fiduciary duty (Count IV).

**IT IS SO ORDERED.**